HUNDLEY LYNN FORD, JR.,

     Plaintiff,

    v.

PARTHASARATHI GHOSH, IMAT CARTER,
LA TANYA WILLIAMS, AND WEXFORD
HEALTH SOURCES, INC.,

     Defendants.

No. 12 CV 4558

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Hundley Lynn Ford, Jr. brought this suit under 42 U.S.C. § 1983, complaining that allegedly inadequate care he received for a back injury while imprisoned at Stateville Correctional Center rose to the level of cruel and unusual punishment under the Eighth Amendment. Plaintiff brings this claim against the individuals who treated him—Dr. Parthasarathi Ghosh, Dr. Imat Carter, and physician assistant La Tanya[1] Williams—as well as against their employer, Wexford Health Sources, Inc. All four defendants now move for summary judgment. For the following reasons, their motion is granted in part, and denied in part.

## I.    Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[1] Ms. Williams has been variably referred to as "Latoya," "Latonya," and "La Tanya" in this case. Because she stated and spelled her name as "La Tanya" when asked at her deposition, that is the spelling I will use.

matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

## II. Background

Plaintiff Hundley Lynn Ford, Jr. was incarcerated by the Illinois Department of Corrections at the Stateville Correctional Center. Dkt. 149[2] ¶ 1. While moving his property box on about April 20, 2008, plaintiff felt a "pop" in his lower back. Dkt. 158 ¶ 1. Intense pain immediately radiated down from his lower back to his legs. *Id*. The pain stayed with plaintiff, even as the days, months, and years went on. *Id*. ¶ 2. Plaintiff experienced the continued discomfort as "a stabbing pain on [his] left side at the bottom of [his] back right above [his] hip, [along with a] pain shoot[ing] down [his] left leg [which went] numb [along with his] whole lower body . . . at times . . . ." *Id*. Plaintiff sought treatment from the medical providers at Stateville. The professionals he saw were employees of the private company Wexford Health

---

[2] Citations to Dkt. 149 are made only to defendants' Statement of Undisputed Facts and plaintiff's responses thereto (i.e., the first 119 paragraphs). To avoid confusion, I cite to Dkt. 158 for any reference to plaintiff's Statement of Additional Facts.

Sources, Inc.—an entity the Department of Corrections had contracted to deliver inmate health services. *Id*. ¶ 7; Dkt. 149 ¶ 2.

The present lawsuit stems from the treatment plaintiff received from three Wexford employees over a several year period, namely La Tanya Williams (a physician assistant), Dr. Parthasarathi Ghosh (Stateville's medical director from 2003 to March 2011), and Dr. Imat Carter (Stateville's medical director from July 11, 2011 to May 13, 2012).[3] Dkt. 149 ¶ 2.

Plaintiff alleged several different theories of liability. First, plaintiff claims the individual defendants were deliberately indifferent to his diffused discs. Dkt. 12. ¶ 74. Second, plaintiff believes all defendants abided by a pattern or practice of deliberately postponing off-site treatment as a way to save money (i.e., the "cost-cutting" theory of liability). *Id*. ¶ 76. Third, plaintiff alleges that all defendants abided by a pattern or practice of failing to ensure (1) that plaintiff's medical permits and prescriptions were renewed in a timely fashion, or (2) that he was not prescribed harmful or ineffective medicine. *Id*. ¶ 77. Finally, plaintiff claims that Dr. Carter implemented a policy of voiding all treatments authorized by Dr. Ghosh. *Id*. ¶ 78.

In response to defendants' motion for summary judgment, plaintiff articulates a theory that Wexford's practice or custom of allowing a sick call backlog

---

[3] Plaintiff also brought this suit against Illinois Department of Corrections officials and employees Director S.A. Godinez, Warden Marcus Hardy, Darryl Edwards (Assistant Warden of Operations), Superintendent Nancy Pounovich, Anna McBee (Grievance Officer), Landria Dennis (Correctional Counselor), and Joseph Sheehey (Medical Technician). Dkt. 149 ¶ 3. Plaintiff settled with these defendants before the Wexford defendants filed the present motion. *Id*.

to amass caused plaintiff needless pain for a period of months. Dkt. 150 at 10, 14-16. Defendants argue that, in so doing, plaintiff is trying to amend his complaint by means of his response brief because "[t]he Amended Complaint does not contain a cause of action related to alleged 'sick call' 'backlogs.'" Dkt. 159 at 14. Defendants are correct that plaintiff did not use these exact terms together to plead a claim, but plaintiff did allege that:

> Defendants Wexford, Dr. Ghosh, Dr. Carter, and Williams' pattern and practice of refusing to take any measures to ensure Mr. Ford's medical permits and prescriptions were renewed in a timely fashion or to ensure that Mr. Ford was not repeatedly prescribed pain medications which were known to cause his stomach to bleed or to be ineffective amounts to a deliberate indifference to Mr. Ford's serious medical need.

Dkt. 12 ¶ 77. This allegation presents the precise theory upon which plaintiff continues to rely. *See* Dkt. 150 at 10 ("Because prescriptions and permits can only be obtained during sick call, delays in sick call also result in delayed prescription and permit renewals."). Thus defendants' argument fails to the extent it seeks to preclude plaintiff from arguing that Wexford is liable for being deliberately indifferent to a pattern of sick call delays that caused plaintiff harm by denying or delaying his access to permits and prescriptions.

Plaintiff failed to respond to several summary judgment arguments defendants made in response to theories of liability plaintiff alleged in his amended complaint, including (1) that defendants deliberately postponed off-site treatment, (2) that defendants did not ensure plaintiff's pain medications were safe and effective, and (3) that Dr. Carter voided all treatments authorized by Dr. Ghosh. Dkt. 12 ¶¶ 76-78. Thus, the only claims still in dispute (and in the case) are (1) that

the individual defendants were deliberately indifferent to plaintiff's diffused discs, and (2) that Wexford's practice or custom of allowing a sick call backlog to amass caused plaintiff needless pain for a period of months.

**Physician Assistant Williams's Treatment of Plaintiff**

The first Wexford employee plaintiff saw for his back was physician assistant Williams on October 1, 2008. Dkt. 149 ¶ 75. Williams observed that plaintiff's lumbar spine had "minimal tenderness with palpation, that he had a full range of motion, no spasm and that his neurologic exam was intact." *Id.* She prescribed Tylenol and analgesic balm, and she discussed exercise and stretching. *Id.*

Williams next examined plaintiff on May 20, 2009, at which time he complained of right arm numbness—off-and-on for two weeks—as well as back spasms. *Id.* ¶ 76. Williams ordered an x-ray of plaintiff's right shoulder and elbow, and prescribed him a muscle relaxer (Robaxin) and a pain reliever (Naproxen). *Id.*

Williams examined plaintiff again on June 17, 2009. *Id.* ¶ 77. This time he complained of his back going out, numbness, and stabbing pain. *Id.* Williams assessed him for chronic low-back pain and for possible disc herniation. *Id.* Williams also decided to refer plaintiff to be seen by Dr. Ghosh—the then-medical director— for a possible MRI to rule out disc herniation. *Id.* Williams had to make this referral because she did not have authority to order an MRI herself. *Id.* Williams also referred plaintiff for a physical therapy evaluation to see if that would help ease his

pain.[4] *Id*. Finally, Williams refilled plaintiff's prescriptions for Robaxin, Naproxen, and analgesic balm. *Id*.

Williams next saw plaintiff on June 10, 2011. *Id*. ¶ 79. He complained that a back brace he received had been confiscated because he had not been given a permit for it, so Williams gave plaintiff a six-month permit. *Id*. Williams also learned that plaintiff had not yet been to the University of Illinois at Chicago pain clinic, as Dr. Ghosh had ordered on January 25, 2011. *Id*. ¶¶ 79-80. Williams noted in plaintiff's file: "[c]heck with medical records [regarding] the status of the referral to the pain clinic as per Dr. Ghosh's visit with patient on January 25, 2011." Dkt. 147-14 at 120:7-13. At her deposition, Williams explained she made this note because "obviously the patient [was] still having pain and [he] was told that he was going to the pain clinic." *Id*. at 122:13-18. Williams could not recall whether she personally followed up on the note. Dkt. 123:19-124:12.

Finally, on July 8, 2011, Williams saw plaintiff at a hypertension clinic, and he told her he had still not been to the UIC pain clinic. Dkt. 149 ¶ 81. Williams once more reflected this fact in plaintiff's file. Dkt. 158 ¶ 14.

**Dr. Ghosh's Treatment of Plaintiff**

Dr. Ghosh first examined plaintiff on June 28, 2010. Dkt. 149 ¶ 83. He ordered him an MRI[5] and gave him permits for ice, medical restraints, and a lower

---

[4] Plaintiff did not receive physical therapy until March 2010. Dkt. 158 ¶ 11.

[5] If a Wexford doctor wished to refer his patient to an off-site provider, Wexford policy required the physician to first present the request to Wexford's Utilization Management Committee for "collegial review." Dkt. 158 ¶ 17. This consisted of a weekly phone call between a physician reviewer, a utilization nurse, a site scheduler, and the requesting

bunk. *Id*. Dr. Ghosh submitted the MRI request to the Utilization Management Committee for collegial review that same day. Dkt. 149 ¶ 84.

A few days later, on July 1, 2010, the Committee followed up on the request for plaintiff's MRI by faxing Dr. Ghosh a form asking for more information on plaintiff's treatments up to that point in time, including the physical therapy he had been prescribed, any prior imagings he had undergone, medications he had taken, or any other "conservative treatment" he had received. *Id*. ¶ 85. The parties dispute how Dr. Ghosh responded to this request. Plaintiff claims he did not respond at all, and that he likewise failed to respond when the Committee re-sent Dr. Ghosh the same questions on August 3 and November 1, 2010. Dkt. 158 ¶ 21. By contrast, the doctor claims he responded to the July request by hand writing a note, but that the healthcare unit's medical records director committed a "clerical error" and did not transmit it to the Committee. *Id*. ¶ 21; Dkt. 149 ¶ 87; Dkt. 159 at 7. Dr. Ghosh testified that, as of August 3, 2010, he was not aware the Committee was still looking for the information it requested on July 1, 2010. Dkt. 149 ¶ 90.

The Committee approved plaintiff's MRI on November 23, 2010 and plaintiff underwent the procedure on January 13, 2011. *Id*. ¶¶ 91-92. On January 25, 2011, Dr. Ghosh reviewed the findings and told plaintiff that he suffered from degenerative disc disease. *Id*. ¶ 92; Dkt. 158 ¶ 23. As result, Dr. Ghosh noted in plaintiff's file that he should be referred to the UIC pain clinic for a spinal epidural

---

medical director. *Id*. ¶ 18. Only after the medical director presented the patient's case could a decision be made on whether the requested procedure was approved, denied, or whether more information was needed. *Id*.

injection—a referral that also needed to be approved by the Committee. *Id*. ¶¶ 92-93.

Plaintiff suggests Dr. Ghosh never submitted this request to the Committee because no documents reflect any such submission. Dkt. 158 ¶ 24. For his part, Dr. Ghosh testified that a nurse would have made sure that a consultation form was filled out and taken to medical records for faxing to the Committee. Dkt. 149 ¶ 93. Dr. Ghosh retired from Stateville on March 31, 2011, at which time plaintiff had not yet gone to the pain clinic. Dkt. 158 ¶¶ 16, 24.

**Dr. Carter's Treatment of Plaintiff**

On July 11, 2011, Dr. Carter took over as Stateville's medical director after a series of interim medical directors. Dkt. 158 ¶ 25. Dr. Carter first saw plaintiff on July 27, 2011 at a sick call. *Id*. ¶ 26. Plaintiff claims he told the doctor he was still awaiting care at the UIC pain clinic, but the admissible evidence plaintiff cites does not support that claim. *See* Dkt. 158 ¶ 26 (citing Dkt. 147-3 at IDOC202 (inadmissible hearsay); Dkt. 147-2 at F57 (no mention of a referral to the UIC pain clinic)). Nevertheless, plaintiff's medical file did contain notes to that effect from examinations with Williams on June 10 and July 8, 2011. *See* Dkt. 147-2 at F54-55. Plaintiff also filed grievances on July 21, July 23, July 29, August 21, and August 26, 2011 about his lack of medical treatment and the absence of progress on his referral to the pain clinic. Dkt. 158 ¶ 27. Plaintiff claims Dr. Carter would have seen and discussed these grievances at monthly quality improvement meetings that Dr. Carter attended. *Id*. ¶ 29; Dkt 150 at 11.

Dr. Carter next examined plaintiff on September 23, 2011. Dkt. 149 ¶ 94. Plaintiff told him that he had still not been to the UIC pain clinic as Dr. Ghosh had ordered on January 25, 2011. *Id*. ¶ 95. Dr. Carter attempted to send plaintiff to the clinic by engaging the Committee, which met and approved the referral on October 3, 2011. *Id*. Plaintiff was scheduled to go to the pain clinic on December 6, 2011, but when he learned he was not permitted to wear medical restraints (which were less burdensome than the alternative "black box restraints"), plaintiff refused to go. Dkt. 158 ¶ 31; Dkt. 149 ¶ 98. Although Dr. Carter denies causing or authorizing the decision not to send plaintiff to UIC on December 6, 2011, Dkt. 149 ¶ 99, former-defendant Superintendent Pounovich testified that she would have asked for plaintiff to go in black box restraints, rather than medical restraints, only if the doctor had suggested the latter were not necessary, Dkt. 158 ¶ 32.

On January 30, 2012, Carter arranged for plaintiff to be sent to the pain clinic on February 15, 2012. *Id*. ¶ 33. Plaintiff was permitted to wear medical restraints so he made the appointment. *Id*. However, when the UIC doctors attempted to administer the procedure—an epidural injection—plaintiff was unable to tolerate the pain, and so it was not successful. *Id*.

## III. Analysis

### A. Exhaustion of Administrative Remedies

Defendants argue that plaintiff's claims are barred by the Prison Litigation Reform Act because he did not exhaust his administrative remedies. The PLRA

provides that "[n]o action shall be brought with respect to prison conditions[6] . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Each state's prison grievance system defines the contours of the PLRA's exhaustion requirement. S*ee Jones v. Bock*, 549 U.S. 199, 218 (2007).

The Illinois Department of Corrections uses a three-step grievance process. First, the inmate must try to resolve his issue with a grievance counselor. 20 Ill. Admin. Code § 504.810(a). Second, the inmate can file a written grievance with a grievance officer, but only within 60 days from the "discovery of the incident, occurrence, or problem that gives rise to the grievance." *Id*. The written grievance must contain:

> [F]actual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

*Id*. § 504.810(b). If an inmate files a written grievance, the officer must consider it and report his findings to the Chief Administrative Officer, who in turn reports her decision to the inmate. *Id*. § 504.830(d). Third, if the inmate is still not satisfied, he can appeal the Chief Administrative Officer's decision to the Administrative Review Board for a final decision. *Id*. § 504.850(a).

---

[6] Complaints of a prisoner's medical treatment constitute complaints "with respect to prison conditions" under the PLRA. *Witzke v. Femal*, 376 F.3d 744, 751 (7th Cir. 2004).

The Seventh Circuit requires strict adherence to the PLRA's exhaustion requirement. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Nevertheless, because the purpose of exhaustion is to give prison officials an opportunity to address an inmate's claims internally before litigation, a prisoner's procedurally deficient grievance will not preclude litigation if prison officials took up his administrative complaint on the merits. *Maddox v. Love*, 655 F.3d 709, 721-22 (7th Cir. 2011).

Defendants argue plaintiff did not exhaust his administrative remedies with regard to Williams, Dr. Ghosh, and Wexford. Dkt. 133 at 2-3. For Williams, defendants contend that plaintiff filed his first grievance mentioning her on May 5, 2011—too late to cover her 2008-2010 conduct. *Id*. For Dr. Ghosh, defendants argue that plaintiff filed his grievance about the delayed MRI referral more than 60 days after the MRI took place. *Id*. at 3. And for Wexford, defendants argue that plaintiff never named Wexford, or a cost-cutting theory of liability, in any grievance. *Id*.

Defendants do concede, however, that plaintiff fully exhausted his grievance of May 5, 2011, *id*. at 3, which said in pertinent part:

> Over 3 1/2 years ago my spine was injured, after several month[s] of drop[p]ing sick call request[s] in the request box for sick call located in C-House I was seen by Dr. Williams, who gave me pain pills and a backbrace "'which was taken" because she failed to give me a permit for it. She also recommended I be given a MRI to diagnose the problem with my spine. And she put me on a 1 year waiting list to have physical therapy on an undiagnosed problem. After the wait and therapy I was referred to Dr. G[h]osh who finally ordered the MRI which showed disk problems in my spine according to the U[niversity] of I[llinois]. . . . After years of pain and neglect by Stateville HCU I was sent out for a MRI. . . . The problem is I have been in pain for over 3

11

years all while seeking medical attention. Yet I wasn't diagnosed and was left in pain. And the delay continues.

Dkt. 12 at 44-45.

I find that the contents of this grievance sufficiently put prison officials on notice of plaintiff's allegations against Williams concerning her 2008-2010 conduct, namely that Williams gave plaintiff ineffective pain medicine, and that she failed to properly examine and diagnose him. Dkt. 12 ¶¶ 25-26. The timing of plaintiff's grievance is clearly consistent with the 2008-2010 period alleged in plaintiff's complaint. Further, plaintiff's reference to Williams putting him on a year-long waitlist for "an undiagnosed problem" is sufficiently related to his claim that she failed to properly examine and diagnose him. Finally, plaintiff's reference to Williams giving him pain pills—in the context of a formal grievance—can reasonably be construed as a complaint that the drugs were ineffective. *See Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004) (giving inmate's grievance a "generous construction"). Although prison officials likely could have refused to consider most of plaintiff's grievance as untimely, they instead disposed of it on the merits. Dkt. 133 at 3. As such, I will not now "second-guess that decision" by ruling it untimely. *Riccardo*, 375 F.3d at 524 ("when a state treats a filing as timely and resolves it on the merits, the federal judiciary will not second-guess that action, for the grievance has served its function of alerting the state and inviting corrective action.").

Likewise, I find this grievance sufficiently put prison officials on notice of plaintiff's allegations against Dr. Ghosh relating to the delay in plaintiff's MRI.

Plaintiff complained that "[a]fter years of pain and neglect by Stateville HCU [he] was sent out for a MRI." Notably, plaintiff did not say that "after years of pain and neglect he was *referred* for an MRI." Given a generous construction, this demonstrates that plaintiff was complaining of the delay between Dr. Ghosh's referral and plaintiff actually being sent out for the MRI. Again, though prison officials could have denied this aspect of the grievance as untimely, they did not.

Finally, I find that this grievance sufficiently put prison officials on notice of plaintiff's allegations against Wexford and its alleged cost-cutting policy. Plaintiff's May 5, 2011 grievance made reference to numerous delays in his treatment and to the numerous times plaintiff's sick call requests were ignored. Dkt. 12 at 44-45. Likewise, plaintiff's July 29, 2011 grievance referenced the delayed referral to the UIC pain clinic. Dkt. 147-3 at 4-5. Taken together, these grievances supplied prison officials the required fair opportunity to address plaintiff's complaint because they alerted them to a problem with delays in treatment and permitted them to examine whether Wexford's policies or practices were to blame. Nor was plaintiff under any obligation to understand the contractual intricacies of how the Illinois Department of Corrections cared for the health of its inmates at Stateville. *Accord Conley v. Birch*, 2012 WL 4202702, *5 (S.D. Ill. Sept. 19, 2012) ("Holding otherwise would be an odd result: a corporate defendant (who presumably works with the prison officials in charge of reviewing grievances) could avoid liability because a prisoner (whose interaction with the prisoner health system is limited to doctors and nurses,

whom he may not even know work on a contract basis) would be required to grieve corporate policies.") (quotation omitted).

Plaintiff exhausted his administrative remedies with regard to Williams, Dr. Ghosh, and Wexford.

## B. Deliberate Indifference

The Supreme Court has interpreted the Eighth Amendment's prohibition of cruel and unusual punishment, incorporated through the Fourteenth Amendment, as imposing a duty on states to provide medical care to inmates. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Prison officials violate the Constitution if they are deliberately indifferent to a prisoner's serious medical needs. *Id.* at 104.

To prove a claim for deliberate indifference, a plaintiff must show: (1) that he had an objectively serious medical condition; (2) that the defendant knew of the condition and was deliberately indifferent to treating the plaintiff; and (3) that this indifference injured plaintiff. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Under the second prong, the plaintiff must show that the defendant "acted with the requisite culpable state of mind." *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999). This inquiry has two components. The defendant must have had subjective knowledge of the risk to the inmate's health, and the official also must have disregarded that risk. *See Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). Evidence that the official acted negligently is insufficient to prove deliberate indifference. *See Payne for Hicks v. Churchich*, 161 F.3d 1030, 1040 (7th Cir. 1998). Rather, "'deliberate indifference' is simply a synonym for intentional or reckless

conduct, [and] 'reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999).

As for the third (injury) prong, when prison officials delay rather than deny medical assistance to an inmate, courts have required the plaintiff to offer "verifying medical evidence" that the delay (rather than the inmate's underlying condition) caused some degree of harm. *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007). This harm can be shown by demonstrating that the delay worsened the inmate's underlying condition, or that it caused the inmate prolonged and unnecessary pain. *Smith v. Knox County Jail*, 666 F.3d 1037, 1039-40 (7th Cir. 2012); *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009); *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004). While expert testimony that a delay caused harm is sufficient to satisfy this requirement, it is not necessary. *Williams*, 491 F.3d at 715.

Defendants say the undisputed record shows that Williams, Dr. Ghosh, Dr. Carter, and Wexford are entitled to judgment as a matter of law on plaintiff's deliberate indifference claim. Defendants do not dispute that plaintiff has an objectively serious medical condition, so for each defendant I address only the second and third prong of the deliberate indifference analysis.

### 1.      Williams

Plaintiff believes there is a genuine dispute of material fact as to whether Williams was deliberately indifferent because (1) plaintiff did not receive an MRI until nearly 18 months after Williams said a herniated disc should be ruled out; (2)

plaintiff had to wait over nine months to begin physical therapy; (3) Williams noted on June 10, 2011 that it was necessary to check with medical records regarding the status of Dr. Ghosh's January 25, 2011 referral to the pain clinic; and (4) she made a similar note on July 8, 2011. Dkt. 150 at 6-7.

I find that plaintiff's evidence does not create a genuine issue of material fact as to whether Williams was deliberately indifferent. First, there is no evidence that Williams was personally responsible for either the 18-month delay in plaintiff having an MRI, or in the nine-month delay in him receiving physical therapy. In fact, plaintiff presents no evidence of Williams's involvement in any treatment he received from June 17, 2009—the date Williams referred plaintiff for both treatments—through June 10, 2011. Dkt. 158 ¶¶ 9-12. By then, plaintiff had already had his MRI and had also begun physical therapy. Dkt. 150 at 6.

Second, while it is possible that Williams failed to follow up on plaintiff's June and July 2011 complaints, plaintiff presents no evidence capable of supporting an inference that this failure was intentional or reckless. To the contrary, the undisputed evidence shows that Williams's treatment of plaintiff was on the whole responsive and reasonable given her limited authority.

Williams's motion for summary judgment is granted.

## 2. Dr. Ghosh

Plaintiff opposes defendants' motion as to Dr. Ghosh by purporting to present evidence of the doctor's liability under two separate theories. First, plaintiff points to evidence that sick call at Stateville was plagued by delays and backlogs, and that

he was specifically harmed by these problems. Dkt. 150 at 10; *see also* Dkt. 158 at ¶¶ 39-53. According to plaintiff, Dr. Ghosh was aware of these issues, responsible for them as medical director, and nevertheless deliberately indifferent to them. Dkt. 150 at 10. Plaintiff's evidence on this theory, however, is insufficient to create a genuine fact dispute because he cites to no evidence from which a reasonable jury could infer that Dr. Ghosh knew the sick call backlogs were harming plaintiff specifically. Plaintiff demonstrates only (1) that Dr. Ghosh was contractually responsible for "supervis[ing] and direct[ing] the clinical activities of all health care staff," (2) that "medical directors [were] 'ultimately responsible for all healthcare delivered at the site," and (3) that "sick call [was] 'the fundamental building block' of access to care." Dkt. 150 at 10 (citing Dkt. 158 ¶ 39). Plaintiff purports to demonstrate that "Ghosh was aware of the delays and backlogs in sick call, [because they] were discussed in Quality Assurance and Warden meetings he attended." Dkt. 150 at 10 (citing Dkt. 158 ¶ 43). However, the statement of fact plaintiff cites in support of this assertion does not actually pertain to plaintiff's assertion.[7] Even if it did, though, plaintiff's evidence would remain insufficient because no evidence supports the inference that Dr. Ghosh knew the sick call delays were specifically harming plaintiff by exacerbating his condition or causing him needless pain. As

---

[7] "Dr. Funk testified that backlogs could be an indication of understaffing and acknowledged that staffing levels can affect the time frame by which healthcare generally is provided. Ex. 10, Funk Dep. 94:16-95:2, 143:17-144:7. He also testified that there are no specific metrics Wexford uses to determine whether staffing levels are sufficient to address inmate needs, but that one way Wexford determines whether staffing levels are appropriate is by tracking sick call services. *Id*. at 88:14-89:17." Dkt. 158 ¶ 43. These facts do not support an inference that Dr. Ghosh was aware of the delays and backlogs in sick call as result of Quality Assurance and Warden meetings he attended.

such, Dr. Ghosh could not have been deliberately indifferent to plaintiff's serious medical need (in this way).

Plaintiff's second theory is that Dr. Ghosh's failure to follow up on his referrals for the MRI and pain clinic constituted deliberate indifference. Dkt. 150 at 7-9. Concerning the delayed referral to UIC, Dr. Ghosh's failure to send the referral to the Committee before retiring from Stateville could potentially support a reasonable inference that he was deliberately indifferent to plaintiff's serious medical need. Nevertheless, summary judgment is appropriate on this theory because plaintiff does not present any evidence that could reasonably support an inference that plaintiff would have been able to tolerate the epidural injection if he had not experienced the two-month delay attributable to Dr. Ghosh. Plaintiff offers only the following colloquy from his expert's deposition:

> Q. Do you have any reason to believe that Mr. Ford would have been able to tolerate the shot had it been done any earlier?
>
> A. That is a very good question, and here's my answer. As we all know, the longer a patient has pain the less tolerant of the pain the person generally becomes. So that any aggravation is magnified. A person who has pain for a day is going to have a different psychological response to the pain than the person who's had it for six months, a year, year and a half, something like that. So the answer to your question is maybe. Had the shot been done earlier, he would have been able to tolerate it. Maybe he wouldn't have. I don't know.
>
> Q. If you have opinions, let's try to keep it to a reasonable degree of medical certainty. Do you have an opinion to a reasonable degree of medical certainty that had this shot been done earlier, months earlier, he would have been able to tolerate it?
>
> A. There is a good possibility that he would have been able to. I can't prove that.

18

Q. Do you have any --

A. I know what you're asking.

Q. Do you have any basis for your --

A. I can't answer the question.

Q. Do you have any basis for your opinion? Is there anything within the record that you could show me that would suggest that he would have been able to tolerate the needle better six months ago, eight months?

A. Just the longevity of the pain. That's the only basis that I would have.

Dkt. 147-4 at 62:13-63:23. This answer, which is the only evidence plaintiff presents of any harm potentially caused by Dr. Ghosh's delayed referral to the pain clinic, does not provide the reasonable basis necessary to support a jury's verdict. Plaintiff's expert's speculation is not proper evidence for a jury to infer that plaintiff would have received an epidural injection earlier. Thus this theory fails.

As for plaintiff's delayed MRI, plaintiff has submitted evidence that after Dr. Ghosh sent the MRI referral to the Committee he failed to respond to their requests for additional information three times. Dkt. 158 ¶¶ 21-22. All three requests, moreover, were sent to his attention as medical director. *Id*. Defendants attempt to explain this occurrence by declaring it a "clerical error" on the part of the healthcare unit's medical records director. Dkt. 159 at 7. But whether that is true is a question of fact best left to a jury. By contrast, the question I must now answer is whether, "when viewing the record in the light most favorable to [plaintiff], a reasonable trier of fact *could* conclude that [Dr. Ghosh] was subjectively aware of [plaintiff's] serious medical condition and either knowingly or recklessly disregarded it." *Hayes v.*

*Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (emphasis in original). Here, a reasonable jury could answer 'yes' on both counts. Dr. Ghosh's subjective knowledge is evidenced by the fact he referred plaintiff for the MRI in the first place. And his knowing or reckless disregard could be inferred from (1) the five-month delay in supplying the needed information, (2) the potentially incredible "clerical error" explanation for the three missed requests, and (3) Dr. Ghosh's impending retirement from Stateville. Further, plaintiff has set forth evidence that this delay harmed him. Specifically, when asked if the delay in getting the MRI caused plaintiff "any injury," plaintiff's expert answered "probably, yes," explaining:

> If the first MRI were taken earlier, then the appropriate treatment could have been instituted earlier, and the portions of his symptoms, which in my opinion became chronic, might not have become chronic. . . The acute radiculopathy became a chronic radiculopathy. The acute pain became chronic pain. Chronic pain is much more difficult to treat.

Dkt. 147-4 at 64:23-65:3, 67:23-68:6.

Accordingly, plaintiff has demonstrated a genuine dispute of material fact as to this theory of liability, and so I consider defendants' argument that Dr. Ghosh is entitled to qualified immunity. "In actions under 42 U.S.C. § 1983 alleging violations of constitutional rights, qualified immunity shields an official from liability for civil damages, provided that the illegality of the official's conduct was not clearly established at the time he acted." *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). It is all but certain in this circuit that private doctors providing medical services to inmates are not entitled to assert qualified immunity. *See Currie v. Chhabra*, 728 F.3d 626, 631-32 (7th Cir. 2013). But even assuming that Dr. Ghosh may assert the defense, the Seventh Circuit has previously held that a delay in the

provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate indifference claim, so long as the medical condition is sufficiently serious or painful. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). In *Grieveson*, the court held that evidence showing that guards let the plaintiff sit in pain with a broken nose for a day and a half, sufficed to create a genuine issue of material fact. *Id. Grieveson* was thus sufficiently analogous to put Dr. Ghosh on notice that his alleged conduct violated plaintiff's clearly established right.

### 3.    Dr. Carter

Plaintiff argues Dr. Carter was deliberately indifferent to his serious medical need by (1) delaying plaintiff's referral to UIC, and (2) intervening in plaintiff's transport to UIC once an appointment was actually scheduled. Dkt. 150 at 10-11. Plaintiff presents evidence from which a jury could reasonably conclude that the doctor knew—as of late July or early August 2011—that plaintiff had still not gone to the pain clinic, specifically (1) that plaintiff's medical chart contained such a notation and (2) that plaintiff filed numerous grievances on the issue that would have been discussed at Dr. Carter's monthly meetings. Dkt. 150 at 11. Additionally, plaintiff presents evidence that Dr. Carter may have suggested to Pounovich that plaintiff did not require the medical restraints. Dkt. 150 at 11. Because plaintiff needed medical restraints to keep his back from "flaring up," his inability to use them resulted in him refusing to keep his December 6, 2011 appointment. Dkt. 149 ¶ 101; Dkt. 158 ¶ 31.

Although plaintiff's evidence thus likely creates a genuine issue of whether Dr. Carter's conduct was sufficiently intentional or reckless, plaintiff presents insufficient evidence that the physician's alleged conduct caused plaintiff unnecessary pain. The expert testimony already discussed is the only evidence plaintiff offers in support of his claim that he would have been able to endure the epidural injection at UIC if he had gone earlier. As noted, though, the expert's statements were far too agnostic and speculative to reasonably support the conclusion for which plaintiff offers them.

Dr. Carter's motion for summary judgment is granted.

### 4.    Wexford

Wexford can be held liable under section 1983 only if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. *See Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690 (1978)). A plaintiff pursuing a "practice or custom" theory of liability must show that policymakers were "deliberately indifferent as to the known or obvious consequences" of that practice or custom. *Thomas*, 664 F.3d at 303 (quotation omitted). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.* (quotation omitted). Finally, the plaintiff must present evidence that

this widespread custom or practice caused *him* a constitutional injury. *Id.*; *Petty v. City of Chicago*, 754 F.3d 416, 424-25 (7th Cir. 2014). Here, plaintiff argues for liability based on Wexford's practice or custom of allowing sick call backlogs to amass. Dkt. 150 at 14-16. The Seventh Circuit's decision in *Thomas v. Cook County Sheriff's Department* offers an instructive example of the kind of evidence plaintiff in this case can present and survive summary judgment.

In *Thomas*, the county appealed the district court's denial of its motion for judgment as a matter of law or for a new trial, which the county filed after a jury found for the mother of an inmate. 604 F.3d at 297. The inmate had died of meningitis in custody after correctional employees failed to respond to his serious medical needs for a week. *Id.* In affirming the lower court's decision, the Seventh Circuit cited evidence of "a widespread practice of failing to review inmates' timely filed medical requests," including testimony that request forms were not collected every day, that the forms were in locked boxes for which not all collectors had keys, and that there was no system for informing supervisors when collectors failed to make their daily rounds. *Id.* The court further noted that trial evidence had "established a link between the failure to check medical requests and [the inmate's] death." *Id.* at 304. For example, some inmates had filed medical request forms on the deceased inmate's behalf, while other inmates had witnessed the deceased inmate fill out his own form. *Id.*

Here, plaintiff presents evidence similar to that presented in *Thomas*. First, plaintiff submits evidence that could reasonably support the inference that Wexford

had a practice or custom of allowing sick call backlogs to amass. Wendy Olsen, a Stateville medical technician, testified that "MD sick call" was "often booked up for a month," and that it was not "unusual for sick call to be booked up for over a month." Dkt. 147-10 at 38:3-39:15. Likewise, Wexford's corporate designee, Dr. Arthur Funk, confirmed that there had been sick call backlogs since 2008. Dkt. 147-11 at 90:7-94:15. Dr. Funk could not say, however, how often backlogs occurred, because he became involved in the sick call issues only when there was a "significant problem." *Id.* To Dr. Funk, a "significant problem" meant a patient not being able to see a physician in under two or three weeks. *Id.* at 93:21-94:15. Plaintiff also presents evidence that, in March and September 2011, Wexford performed internal audits of the medical services it provided. Dkt. 158 ¶ 45. The audits were performed "to give Wexford leadership . . . a current view of how [Stateville] [was] performing." *Id.* In both audits, Wexford awarded itself a score of 0 out of 16 for sick call (though, as defendants note, a score of 0 applied if the audit found that less than 94% of sick call requests were triaged in a timely manner). *Id.* ¶ 46. The March audit emphasized certain shortcomings with the sick call procedures at Stateville, including that (1) no uniform sick call form was adopted or used; (2) sick call was not appropriately triaged; (3) requests were not tracked, logged, or timed; and (4) requests were still not being maintained. *Id.* ¶ 48. The September audit found most of these same deficiencies as well. *Id.* ¶ 49.

Second, plaintiff presents evidence that could support the inference that Wexford policymakers knew of the risks posed by the above custom or practice.

Wexford's March 2011 audit warned that "[f]undamental access to care in [Stateville] does not seem to be in place" and that "[f]ailure to address the sick call process puts the site at significant risk of litigation, negative outcome and potential for court ordered intervention." Dkt. 158 ¶ 47. The March audit also noted that "[o]verall there is little to no improvement in the sick call process following the QA action plan or scorecard this last year." *Id.* ¶ 51. The referenced action plan from "last year" (i.e., 2010) is not in the record, but this conclusion suggests there was one.

Third, the September audit—which still showed the 0 for 16 score and identified most of the same issues relating to sick call—could reasonably be taken as evidence that Wexford policymakers failed to take appropriate steps to correct the obvious risks that resulted from the backlogs. Dkt. 158 ¶¶ 46, 49. Although it could be argued that the audits are evidence of good faith attempts to address the sick call issues, that is a question best left for the jury.

Fourth, plaintiff submits evidence that can reasonably support the inference that Wexford's custom or practice specifically caused plaintiff harm. Plaintiff testified that after his back brace had been confiscated in early 2011, he began submitting sick call requests in order to see a doctor to get a replacement. Dkt. 158 ¶ 52. Although plaintiff began these requests prior to May 5, 2011, he was not able to get an appointment to discuss the brace until June 20, 2011. *Id.* Such evidence is similar to the kind the *Thomas* court deemed sufficient to demonstrate the link between the widespread custom and the plaintiff's death. *Thomas*, 604 F.3d at 304.

Finally, both plaintiff and Williams provided testimony that could support the conclusion that the unnecessarily delayed back brace would have relieved plaintiff of considerable back pain. *See* Dkt. 147-9 at 14:13-19 ("Q. How does your back brace help in any way with your back issue? A. It keeps you kind of compacted. Q. How often do you wear the back brace? A. I wear it all the time. Q. Do you wear it at night to sleep? A. Yeah."); Dkt. 147-4 at 113:5-15 (testifying that back brace alleviates pain). Thus, plaintiff's severe pain was unnecessary and potentially unconstitutionally caused by the sick call backlog.

In sum, because a jury could reasonably conclude that Wexford knowingly failed to appropriately address the widespread custom or practice of allowing sick call backlogs to amass—which proximately caused plaintiff to be without a back brace[8] for a period of months, thereby causing him "many more hours of needless suffering for no reason," *Gil*, 381 F.3d at 662—Wexford's motion for summary judgment is denied.

---

[8] The evidence plaintiff presents regarding the effect the delay in sick call had on him is limited to his lack of a back brace in 2011. *See* Dkt. 158 ¶¶ 52-53. Thus, I clarify that my finding of a genuine issue of material fact as to Wexford's deliberate indifference is limited to those events and does not include access to prescription drugs.

## IV.    Conclusion

Defendants' motion for summary judgment, Dkt. 129, is granted as to defendants Imat Carter and La Tanya Williams, and denied as to defendants Parthasarathi Ghosh and Wexford Health Sources, Inc.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: 9/8/2014